2010 VT 82

**RHOADES SALVAGE/ABC METALS
v. TOWN OF MILTON
SELECTBOARD**

[9 A.3d 685]

No. 09-432

¶ 1. September 27, 2010. Landowner Rhoades Salvage/ABC Metals appeals from a decision denying its application for a certificate of approved location for a junkyard. We affirm.

¶ 2. Landowner operates a junkyard in the Town of Milton. In April 1974, the Town Zoning Administrator issued a certificate of approval for this junkyard pursuant to 24 V.S.A. § 2251, noting that though the junkyard is located in a zoned residential district, the use of the land as a junkyard qualified as a "preexisting nonconforming use" under the Town's zoning laws. Landowner was granted certificates of approval from the Town in 1993, 1996, and 1998. In 2001, however, landowner's location approval lapsed. Landowner paid back taxes and fees to the Town, and in January 2008, landowner applied for a new certificate of approval. Following a hearing by the selectboard, landowner's application was denied.

¶ 3. Landowner appealed the denial to the Chittenden Superior Court pursuant to Vermont Rule of Civil Procedure 75 and moved for summary judgment on the

matter. In its motion for summary judgment, landowner argued that though the statute governing appeals of junkyard location approvals was silent as to the standard of review, the court should analogize to appeals of zoning and other municipal board decisions and employ de novo review. In its reply brief, landowner also requested that it be allowed to supplement its motion after an opportunity to review the transcripts, though it does not appear that landowner ever actually did this. In an order dated May 11, 2009, the court rejected landowner's argument as to the standard of review and concluded that the appropriate review was on the record. The court ordered the Town to prepare, serve, and file a certified transcript of any oral proceedings conducted by the selectboard.

¶ 4. Applying a deferential standard of review to the selectboard's decision, the court examined the statutory criteria provided in 24 V.S.A. § 2254 and looked to whether there was "some rational basis" for the selectboard's denial of the certificate. The court ultimately affirmed the selectboard's denial of landowner's junkyard location application. This appeal followed.

¶ 5. On appeal, landowner makes three arguments: (1) the superior court applied the improper standard of review in upholding the denial; (2) the denial was not supported by the facts; and (3) landowner was erroneously denied compensation for the costs of relocating the junkyard. We address each in turn.

I.

¶ 6. We review the superior court's legal conclusion with regard to the proper standard of review de novo. See *Barnett v. Town of Wolcott*, 2009 VT 32, ¶ 5, 185 Vt. 627, 970 A.2d 1281 (mem.) ("Our review of legal conclusions . . . is nondeferential and plenary."); *Searles v. Agency of Transp.*, 171 Vt. 562, 562, 762 A.2d 812, 813 (2000) (mem.) (where issue is one of law "our review is nondeferential and plenary").

¶ 7. To operate a junkyard, a landowner must obtain a certificate of approval for the location of the junkyard from the town municipal board. 24 V.S.A. § 2242. Following a decision by the municipal board granting or denying an application, a party may appeal to the superior court. *Id.* § 2255.[1] The statute, however, is silent as to the standard of review to be employed by the superior court:

> Any person dissatisfied with the granting or denial of an application may appeal to the superior court for the county in which the proposed junkyard is located. The court by its order may affirm the action of the legislative body or direct the legislative body to grant or deny the application.

*Id.*

¶ 8. The superior court here, analogizing to the presumption of on-the-record review of agency decisions, limited its review to "whether, on the record developed before the agency, there is any reasonable basis for the finding." Landowner, however, argues that the court erred by failing to review the denial of the certificate de novo and that the decisions relied on by the superior court — all of which involve review of agency decisions — are distinguishable. Landowner argues that unlike an appeal from an administrative agency, whose decisions involve formal proceedings and specific expertise, a town selectboard employs a "very informal proceeding with members having no expertise." Thus, landowner argues, a

---

[1] The statute governing appeals of junkyard location approval certificates was amended in 2009 and now provides for appeal to the Environmental Court. 2009, No. 56, § 13 (adding 24 V.S.A. § 2255(d)). Unless otherwise noted, all citations in this decision are to the statutes in effect at the time of landowner's application.

closer analogy is the appeal process from decisions rendered by municipal panels or boards to the Environmental Court, which are de novo pursuant to separate statutes. See, e.g., 10 V.S.A. § 8504(h) ("The environmental court, applying the substantive standards that were applicable before the tribunal appealed from, shall hold a de novo hearing on those issues which have been appealed . . . ."). Finally, landowner points to the recent amendment to the junkyard statutes changing the appeal process for junkyard location certificate decisions to review by the Environmental Court, where review is generally de novo. 2009, No. 56, § 13 (adding 24 V.S.A. § 2255(d)); see generally V.R.E.C.P. 5(g) & (h).

¶ 9. Landowner's arguments with regard to the appropriate standard of review are unavailing. Notwithstanding landowner's claim that our decision in *Town of Victory v. State*, 2004 VT 110, 177 Vt. 383, 865 A.2d 373, is distinguishable, the analysis employed in that case is relevant. There, we addressed the standard of review governing an appeal of an appraisal of property by the division of property valuation and review to the superior court where the statute was silent as to this issue. We rejected the taxpayer's argument that the superior court should have reviewed the appeal de novo, and noted instead that "we presume that judicial review of administrative decisions is deferential absent a clear statement of contrary intent." *Id.* ¶ 16. We also noted that on-the-record review is particularly appropriate in "contested cases where there has been an adjudication in the agency" and where the adjudicative body has special expertise. *Id.* ¶ 17; see also *Conservation Law Found. v. Burke*, 162 Vt. 115, 126, 645 A.2d 495, 501-02 (1993) ("The nature of review is determined by the Legislature, but we presume that review will be on the record and not de novo."); *Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 294-95, 415 A.2d 216, 218-19 (1980) (stating that judicial review of agency decisions is presumed to be on the record absent specific statutory authorization to the contrary). More recently, we rejected a taxpayer's claim ·that it was entitled to de novo review of an appeal from a denial of a tax refund by the Department of Taxes where the statute was silent as to the appropriate review. See *GP Burlington S., LLC v. Dep't of Taxes*, 2010 VT 23, ¶ 16, 187 Vt. 421, 996 A.2d 180. In rejecting de novo review, we refused to put the superior court "in the position of substituting its decision for agency inaction, without even the benefit of a formal record, in specialized areas ordinarily reserved for the agency to implement policy and apply statutory law" and declined to "have the courts perform these executive functions absent clear legislative authorization." *Id.*

¶ 10. Here, the Legislature has deliberately delegated power to the selectboard, charging that body with applying the broad criteria (not challenged by landowner) outlined in the junkyard location statute. In this role, the selectboard employs the special function of a local legislative body in taking into account purely subjective considerations such as protecting the Town's "attractive environment." See 24 V.S.A. § 2254. The rationale behind limiting review of such decisions is grounded in separation-of-powers principles and the concern that local officials are generally more familiar with the interests of their community and are best equipped to make decisions on local matters, such as location of a junkyard, that will have an immediate effect on the municipality. See *Agency of Transp. v. Wall Mgmt.*, 144 Vt. 640, 643, 481 A.2d 1270, 1272 (1984) (noting that where statutes grant municipal entity broad discretion with respect to a determination of highway location and route, "we will not interfere with that determination as long as it is made in good faith and is not capricious"); 5 E. McQuillin, The Law of Mu-

nicipal Corporations § 18.4, at 626 (rev. 3d ed. 2004) ("[T]he general rule is uniformly applied that powers granted in comprehensive terms must be reasonably exercised. It is the province of the court to protect the individual from unreasonable, oppressive, or arbitrary exercise of power within the limits of our constitutional and legal system."). Thus, absent legislative authorization of de novo review, the superior court was correct in affording deference to the selectboard's determination.[2]

<hr>

[2] Landowner's argument with regard to the significance of the recent amendment of the appeal procedure for junkyard location certificate decisions is similarly without merit. Though the Legislature did indeed change the appeals process so that applicants denied a junkyard location certificate are now generally entitled to de novo review of the application in the Environmental Court, this fact sheds no light on whether de novo review by the superior court was warranted before the change to the statutory scheme. See *Ins. Co. of Pa. v. Johnson*, 2009 VT 92, ¶ 12, 186 Vt. 435, 987 A.2d 276 (" 'What the . . . legislation involved in this case means cannot rationally be influenced by [subsequent] legislation.' " (quoting *Coca Cola Bottling Co. of Northampton v. Comm'r of Revenue*, 473 N.E.2d 187, 189 n.3 (Mass. 1985)). Contrary to the implication of the dissent, the fact that this precise claim will not arise again under the amended statutory scheme has no bearing on our consideration of the issue in this case. Similarly, the fact that the current scheme provides expressly for de novo review of AOT decisions granting or denying junkyard licenses hardly compels a finding that the Legislature intended a similar standard for review of local decisions, as the dissent asserts. On the contrary, it is reasonable to assume that, where the Legislature includes a particular provision in one section and excludes it from another, it has done so intentionally.

¶ 11. Moreover, the record here was adequately developed in the proceeding before the selectboard. The transcripts indicate that, though informal, there were two separate hearings, in which landowner was represented by counsel, as well as a site visit by the selectboard to the junkyard. Landowner had ample opportunity to present evidence during these proceedings. Landowner also had an opportunity to supplement his motion for summary judgment during the appeal before the superior court, but for reasons unknown, he neglected to do so.

II.

¶ 12. Landowner next contends that, even under on-the-record review, the selectboard's findings were contrary to the evidence and the superior court's decision upholding these findings in its grant of summary judgment to the Town was erroneous. Specifically, landowner argues that the selectboard's findings were largely arbitrary and did not provide a "rational connection" to the statutory criteria. We disagree.

¶ 13. In an appeal from a summary judgment, we apply the same standard of review as the superior court. *Doe v. Forrest*, 2004 VT 37, ¶ 9, 176 Vt. 476, 853 A.2d 48. Summary judgment will be affirmed where there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). Further, "[w]here there is an intermediate level of appeal from an administrative body, we review the case under the same standard as applied in the intermediate appeal." *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 195, 733 A.2d 733, 738 (1999). We thus look to whether the record demonstrates, as a matter of law, that the selectboard denied landowner's

<hr>

See *State v. DeRosa*, 161 Vt. 78, 80, 633 A.2d 277, 279 (1993) (we presume the Legislature employed statutory "language advisedly").

junkyard location certificate based on a reasonable application of the statutory criteria of 24 V.S.A. § 2254. See *Tri-State Indus. Laundries, Inc.*, 138 Vt. at 294, 415 A.2d at 218 (looking to whether, "on the record developed before the agency, there is any reasonable basis for the finding").

¶ 14. The statute governing junkyard location approval is fairly broad and requires a municipal board to take into account the following aesthetic, environmental, and community welfare considerations in deciding whether or not to grant a certificate of approval:

> [T]he legislative body may also take into account the clean, wholesome and attractive environment which has been declared to be of vital importance to the continued stability and development of the tourist and recreational industry of the state and the general welfare of its citizens by considering whether or not the proposed location can be reasonably protected from having an unfavorable effect thereon. In this regard the legislative body may consider collectively the type of road servicing the salvage yard or from which the salvage yard may be seen, the natural or artificial barriers protecting the salvage yard from view, the proximity of the proposed salvage yard to established tourist and recreational areas or main access routes, thereto, proximity to neighboring residences, groundwater resources, surface waters, wetlands, drinking water supplies, consistency with an adopted town plan, as well as the reasonable availability of other suitable sites for the salvage yard.

24 V.S.A. § 2254.

¶ 15. Following public hearings held in December 2007 and January 2008 as well as a public site visit to the junkyard, the selectboard made the following findings in support of its decision to deny landowner's certificate of approval: (1) the extent of contamination or lack of contamination related to hazardous and other materials has yet to be determined; (2) not enough details regarding water quality are available and there are concerns with regard to arsenic levels; (3) the plan for tire removal is inadequate and insufficient and the volume of tire material is a potential public health and safety hazard; (4) landowner's hours of operation and activities do not afford adjacent property owners a reasonable degree of enjoyment and use of their property; (5) landowner has failed to adhere to prior enforcement agreements with the Agency of Transportation; (6) landowner's lack of past performance in following statutory procedures and deadlines puts his credibility into question; and (7) lack of participation by representatives from the State of Vermont at the hearings before the selectboard represents a lack of affirmative assurance from the State as to the safety of the junkyard.

¶ 16. With regard to the first two findings, there was adequate evidence presented to the selectboard justifying concern over the junkyard's contribution to water contamination. There were two reports submitted to the selectboard, and both indicated elevated levels of arsenic. Landowner offered testimony from an environmental consultant, who was hired by landowner and who authored one of the reports. The consultant testified that though the high arsenic levels were detected in both his and a second study, he believed that those levels could be naturally occurring. At the very least, these two reports raised a question of whether landowner's operation of the junkyard was contributing to degradation of the surrounding water sources. Given that the burden was on landowner to demonstrate that his operation of a junkyard

would not have an "unfavorable effect" on the "wholesome and attractive environment" surrounding the proposed site, the fact that testimony was inconclusive on the issue of possible water contamination is relevant and weighs against grant of the certificate. See 24 V.S.A. § 2254.

¶ 17. As to the third finding — concern about the volume of tire material on the site — the evidence presented during the selectboard proceedings included testimony from the Town's fire chief who stated that he was concerned about the size of the tire pile and the risk to public safety if the tire pile were ever to catch fire. The fire chief also testified that the fire department had been called in the past following reports of fire at the salvage yard, but that these fires had all been legal. David Joachim, the Zoning Administrator and Health Officer, testified that he had concerns about the health of landowner's neighbors following a legal fire on landowner's property. Though landowner testified that he had entered into an agreement with the State to remove a certain amount of tires from the site by May 2008, the selectboard was skeptical about whether that removal would "put a dent in that pile." This evidence provided more than enough support for the selectboard's conclusion that the volume of tires posed a public health risk.

¶ 18. As to the fourth finding regarding the effect of landowner's operation of the junkyard on its neighbors, the selectboard heard testimony from a number of adjacent property owners. One neighbor testified as to noise complaints stemming from operation of the salvage yard "Monday through Friday sun up to well past sun down" and at least part of the day on Saturday and Sunday. Others testified as to the effect of landowner's burning practices on their use of their property. Rhoades' own testimony with regard to his relationship with his neighbors indicated an unwillingness to accommodate these complaints, including the following statement: "I am not going to give up my right to be able to maintain my equipment, service my equipment and do what I need to do . . . ." Further, Rhoades testified that during the week, "we're apt to be busy from seven thirty in the morning to, on some occasions, to after dark . . . [a]nd some of the people that are voicing their displeasure with it I feel miscalculated where they bought and where they moved." The selectboard's conclusion that the noise emanating from the junkyard "from sun up to well past sundown" would have an unfavorable effect on "the general welfare of [the town's] citizens," 24 V.S.A. § 2254, is thus adequately supported by the record.

¶ 19. Finally, although we agree with the superior court that the fifth, sixth, and seventh findings — which all involved consideration of landowner's past noncompliance with state environmental regulations — are somewhat problematic, there was also at least some basis for the selectboard's hesitation with regard to landowner's future compliance. The Town concedes that the fifth finding — stating that landowner failed to adhere to prior agreements with the State — was in error as it was based on the selectboard's confusion with regard to whether landowner had been required to erect a fence on the property. The sixth finding — essentially stating that landowner's history of noncompliance with state regulations negatively affected his credibility — though broad, had some support. Over the past fifteen years, landowner has had two enforcement actions brought against him by the State and though he is now in "substantial compliance," his past noncompliance as well as the fact that he allowed his certificate of location approval to lapse for eight years, are relevant considerations to whether he will ensure that operation of his junkyard will adequately protect the public's health and general welfare. Finally, we agree that the seventh finding is

wholly irrelevant because the presence or absence of State witnesses at the hearings is not relevant to any of the statutory criteria.

¶ 20. Though landowner is correct that not all of the above findings are adequately tethered to the statutory criteria provided in § 2254, the question before us is whether the selectboard made enough factual findings to justify its decision to deny the certificate. Cf. *In re Eastview at Middlebury, Inc.*, 2009 VT 98, ¶ 31, 187 Vt. 208, 992 A.2d 1014 (concluding that statutory criteria for development permit did not create laundry list of factual findings Environmental Court was required to make, but rather required only that the factual findings the court did make support its legal conclusion); *Greenberg v. Hadwen*, 145 Vt. 112, 116, 484 A.2d 916, 918 (1984) (noting that unessential findings, even if incorrect, are not grounds for reversal). For the reasons stated above, we conclude that it did.

## III.

¶ 21. We do not reach landowner's final claim — that if his application for location approval of his junkyard is denied, he is entitled to just compensation for the removal, relocation, or disposal of the junkyard — because the claim is premature. In support of his argument, landowner relies on 24 V.S.A. § 2264, which formerly provided that "just compensation shall be paid to an owner affected for his reasonable and necessary costs incurred for the landscaping or other adequate screening, or the removal, relocation, or disposal of the following junkyards affected by this subchapter: (1) Those lawfully in existence on July 1, 1969." Because landowner has not demonstrated what, if any, costs may be associated with removal, location, or disposal, his claim is premature. See *In re Robinson/Keir P'ship*, 154 Vt. 50, 57, 573

A.2d 1188, 1192 (1990) ("Courts will ordinarily not render decisions involving events that are contingent upon circumstances that may or may not occur in the future."). The superior court, therefore, did not err in declining to address this claim, and we express no opinion on whether this statute affords the remedy landowner seeks.

*Affirmed.*

¶ 22. **Skoglund, J.,** dissenting. It was a shouting match. Apparently there were local scores to settle. Audience members questioned one another, talked over evidence, and interrupted the selectboard members. Doors were slammed and petty grievances were aired. No "witness" was sworn in. There was no real opportunity to challenge the relevance of testimony or the competence or expertise or bias of any "witness." This is the proceeding the majority equates with a formal agency adjudication. The selectboard's conclusion was something, but it was certainly not in the same league as a decision by an agency created to govern disputes at an administrative level. The interests of due process demand that an appeal of such a determination be conducted de novo in a court of law. Because the majority chooses to ignore this morass under the guise of "separation-of-powers principles," I dissent. *Ante,* ¶ 10.

¶ 23. The majority's recitation of the law — and the trial court's as well — is flawless, but inapplicable. Our jurisprudence is replete with examples of agency deference and recognition of the unique position such bodies hold within our government. See, e.g., *Town of Victory v. State,* 2004 VT 110, ¶ 17, 177 Vt. 383, 865 A.2d 373 (upholding on-the-record review of agency determination based on "separation of powers between the judicial and executive branches" and the recognition

that "this case involves an area in which the agency . . . has special expertise"); *Town of Killington v. Dep't of Taxes*, 2003 VT 88, ¶ 5, 176 Vt. 70, 838 A.2d 91 (noting "the substantial deference that courts have traditionally accorded administrative agencies, particularly where . . . a decision involves highly complicated . . . methodologies within the agency's area of expertise"). It is the combination of specific technical expertise, statutory delegation, and executive policy-making that demand that courts refrain from replacing an agency's policy determination with a judge's own. See *Town of Victory*, 2004 VT 110, ¶ 17; *Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 296, 415 A.2d 216, 219 (1980); see also *Vt. Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 524-25 (1978). But that is not what was at issue here. Here, the trial court was not presented with an agency action, as we have generally understood that term, nor did the underlying proceedings bear the hallmarks of an administrative adjudication to which we afford deferential review.

¶ 24. The traditional deference we extend to administrative decisions stems, in part, from the fact that their decision-making process involves complex topics falling specifically within an agency's unique area of competency. See *Town of Killington*, 2003 VT 88, ¶ 5 ("Absent a clear and convincing showing to the contrary, decisions made within the expertise of agencies are presumed correct, valid and reasonable." (quotation and alterations omitted)). Here, the selectboard does not possess the type of specialized expertise that would entitle its determination to this heightened level of deference. As part of a two-step process to obtain permission to operate a junkyard, a landowner must first seek a certificate of approved location from the municipal legislative body where it intends to operate the facility. 24 V.S.A. § 2251. This body must consider the appropriateness of the proposed location, weighing, among others things, the nature of the surrounding area, the site's proximity to certain public services and highways, the feasibility of preventing the facility from harming health, safety or morals, and general aesthetics. 24 V.S.A. §§ 2253-2254. The trial court and majority — under a new legal theory best described as "too subjective to review" — equate the selectboard's decision with an agency determination because some of the factors inherent in granting a certificate of approved location are purely subjective. That standard seems a far cry from the highly complicated and technical expertise we require of an agency and fails in the context of this case for two reasons.

¶ 25. First, apart from the general aesthetic considerations, many of the factors the selectboard must consider, including the determination of whether the proposed location can reasonably be prevented from harming public health or safety, clearly involve a more specialized knowledge the selectboard members should *not* be presumed to possess. Cf. *Devers-Scott v. Office of Prof'l Regulation*, 2007 VT 4, ¶ 9, 181 Vt. 248, 918 A.2d 230 (holding, in review of decision to strip midwife of license, that administrative law judge's conclusions and application of law were not entitled to deference because ALJ lacked expertise in midwifery). Here, the selectboard's decision to deny the certificate of approved location relied, in large part, on precisely those health and safety considerations that would appear to lie outside the selectboard's general area of expertise. Of the four findings the trial court upheld as having some rational basis, two deal with pollution and water quality, a third with the flammabil-

ity of tires, and the fourth with noise.[3] All of these areas have necessarily technical components and should, in any context, be considered "specialized areas ordinarily reserved for [an] agency," *GP Burlington S., LLC v. Dep't of Taxes*, 2010 VT 23, ¶ 16, 187 Vt. 421, 996 A.2d 180, but there is no rational argument for considering such expertise to lie within the ken of the selectboard. Nor was there competent evidence introduced at the hearing to support any decision on those issues; the selectboard's ambiguous findings — several of which hinged on the "extent of contamination . . . [which] has yet to be determined" and the lack of details regarding water quality — admit as much.[4] Because the selectboard does not possess any technical expertise on the alleged pollution, health impacts, or potential hazards, its findings regarding them are not entitled to the deference of an on-the-record review.

¶ 26. Second, to the degree that the selectboard's decision properly rested on aesthetic considerations within its purview, the application of those subjective factors as part of the grant or denial of a certificate of approved location is akin to other location decisions committed to the discretion of local municipal bodies. See, e.g., 24 V.S.A. § 4460(e) (outlining zoning review functions of appropriate municipal panel). Unlike an agency's decision about a policy matter, the selectboard's up-or-down vote on the location certificate was an adjudication of a landowner's ability to use its property made by applying statutory factors. Like decisions made in the zoning context, which can involve subjective criteria and informal proceedings, this decision should likewise be reviewed de novo to avoid the possibility that interpersonal grievances or long-standing grudges play too great a role in the grant or denial of the certificate.[5] See *Chioffi v. Winooski Zoning Bd.*, 151 Vt. 9, 11, 556 A.2d 103, 105 (1989) (recognizing constitutionality of de novo review of zoning decisions); see also *In re JLD Props.-Wal Mart St. Albans*, No. 132-7-05 Vtec, slip op. at 7 (Vt. Envtl. Ct. Sept. 5, 2006), http://vermontjudiciary.org/GTC/Environ mental/Opinions.aspx ("While sitting as a member of the DRB and deciding on the merits of the application, [the boardmember] was required to set aside the actual hat that he was entitled to wear as a private citizen [advocating permit approval], and to put on instead the metaphorical 'hat' of a disinterested and impartial public decisionmaker."); *In re Dunn*, No. 2-1-98 Vtec (Vt. Envtl. Ct. Mar. 8, 1999) ("Zoning boards are com-

---

[3] The full text of § 2254, "Aesthetic considerations," reveals that the true rationale behind their inclusion is protection of the tourist and recreational industries in the state and that an inquiry into the aesthetics is less about possible nuisance issues (e.g. smoke or noise) and more about "the type of road servicing the junkyard or from which the junkyard may be seen, the natural or artificial barriers protecting the junkyard from view, the proximity of the proposed junkyard to established tourist and recreational areas or main access routes."

[4] The trial court went so far as to suggest that three of the selectboard's seven findings were so unfounded as to "present a . . . compelling case for reversal," and two others "merely state[d] a lack of evidence."

[5] As the majority recognizes, the Legislature's recent change in this statutory procedure clarifies the question central to this case. The fact that this specific issue may not arise again, however, does not make the majority's decision any less rash. Protecting an individual landowner's right to a fair and impartial hearing before a neutral arbiter is essential, and claims of "never again" cannot properly be considered support for such a legal conclusion.

posed of laypeople, 'carrying out a proceeding intended to offer redress without insistence on technical procedural rules.' This very informality is the reason why the appeal before [the Environmental] Court is de novo . . . ." (citation omitted)).

¶ 27. In rejecting landowner's argument for de novo review, the trial court bluntly stated that "[z]oning statutes [were] not applicable or analogous" to the proceeding at hand without providing any citation or rationale to support its conclusion. Contrary to this assertion, the selectboard's decision to deny landowner a certificate of approved *location* is fundamentally a land-use-regulation decision. One prerequisite for an application for approved location is a certificate from the municipal zoning body confirming that the junkyard's "proposed location is not within an established district restricted against such uses or otherwise contrary to the prohibitions of such zoning ordinance." 24 V.S.A. § 2251. Thus, zoning is an essential part of the application process, and the grant or denial of a certificate of approved location cannot logically be divorced from this precept.

¶ 28. Further evidence for the conclusion that the selectboard's decision should be reviewed de novo can be found in the broader context of the licensing statute. The ultimate approval for a junkyard operation requires that, following receipt of a certificate of approved location, landowners apply for a license to operate a junkyard from the state agency of transportation, 24 V.S.A. §§ 2261-2262, a process which is subject to de novo review on appeal. *Id.* § 2283. In considering a junkyard owner's application, the agency must weigh many of the same factors necessarily contemplated by the selectboard in granting or denying a certificate of approved location.[6] Regardless of the

selectboard's determination, the agency must independently find that the applicant can comply with all the provisions of the subchapter and that the operation will not adversely affect public health, welfare or safety. *Id.* § 2262(1)-(3). Under our existing precedent, the agency could properly be considered more technically qualified to conduct this similar analysis than the selectboard. Nevertheless, the Legislature specifically mandated that any appeal of the agency's determination be conducted de novo. *Id.* § 2283. It defies logic to conclude that the Legislature intended for the selectboard to be entitled to a higher level of deference than a more specialized state agency when considering precisely the same technical issues. Cf. *Town of Victory*, 2004 VT 110, ¶ 20 (noting greater statutory deference to state agency appraisal than local town assessment because of agency expertise). To the extent that the majority has created a too-subjective-to-review standard for the aesthetic considerations uniquely within the selectboard's competence, this logic better supports detached review by a neutral body.

¶ 29. Beyond the selectboard's lack of substantive — as opposed to subjective — expertise, de novo review is necessary in this case because the procedure here fell

---

[6] By statute, to grant a landowner a license to operate a junkyard, the agency must consider whether the junkyard has a certificate of approved location, if it will "adversely affect the public heath, welfare or safety and will not constitute a nuisance at common law," and that it can comply with "screening requirements which . . . are capable of feasibly and effectively screening the junkyard from view of the main traveled way of all highways." 24 V.S.A. § 2262(4); cf. *id.* §§ 2253-2254 (listing "Location requirements," including screening and public health impacts, and "Aesthetic considerations," defined as "the clean, wholesome and attractive environment," taken into account in granting certificate of approved location).

short of that used in an agency adjudication, which provides some measure of protection of a party's rights. The Town's lawyer acknowledged that the selectboard meeting on landowner's application for a certificate of approval included "some local scores to be settled." Indeed, portions of the hearing transcript read more like a schoolyard argument than any sort of respectable deliberative process. It bears none of the hallmarks of an administrative agency proceeding entitled to deferential on-the-record review and was far less formal than the zoning board decisions that the trial court reviews de novo. Cf. 24 V.S.A. § 4471; V.R.E.C.P. 5(g). No one was sworn in. Very few witnesses laid a foundation to support their competency to testify and many gave opinions on technical matters with no mention of their qualifications to do so. Landowner's counsel had no opportunity to test the credibility or veracity of participants' assertions through cross-examination. Apart from the selectboard, the only questioning of witnesses came from other witnesses interrupting testimony with pointed questions of their own. Inaudible portions of the recording, created many times by participants talking over one another, left significant gaps in the transcript. Cf. V.R.E.C.P. 5(h) (outlining requirements for on-the-record appeals from zoning decisions). In short, even absent the possible ulterior motives at play, the hearing — which, again, dealt with a property owner's ability to use its land — failed to satisfy even minimal standards of due process.

¶ 30. In stark contrast to this hearing, the deference we now almost automatically accord to administrative tribunals, and which the majority grants the selectboard here, flows in part from the procedural formality designed to protect parties' rights and laid out in the Administrative Procedure Act (APA), 3 V.S.A. § 800. See *Tri-State Indus. Laundries*, 138 Vt. at 295, 415 A.2d at 219

("[W]here the parties have had *an adequate opportunity to develop the facts before the agency*, the function of the courts is solely to review the contested case on the record established below, unless the legislature has specified de novo review of the administrative action in question." (emphasis added)). In *Tri-State*, we held that a taxpayer was not entitled to de novo review of its contested case, in part, because the procedures for the administrative hearing provided the taxpayer with just such an opportunity to present the facts of the case, and "[n]o good purpose would be served by allowing the taxpayer to try its case twice," assuming the dictates of the APA were "properly complied with." *Id.* There, we specifically noted that the Department of Taxes' procedures under the APA included, among other things, an opportunity to cross-examine witnesses and to respond to all issues involved according to the rules of evidence normally applied in a trial court.[7] *Id.* Here, the selectboard proceeding lacked many of these key procedural safeguards so important to protecting the parties' rights, particularly in a matter as fundamental as the use of one's own land. I would not suggest a local board's hearing must comport with the formality of a court of law, but the Legislature has created a model for the more informal procedure of an agency adjudication through the APA. Apparently the majority remains confident that "separation-of-powers principles," *ante*, ¶ 10, preclude the judiciary from stepping in to ensure a party's fundamental rights are protected and would prefer to render landowner's concerns inaudible. I concur

---

[7] The APA also anticipates that persons "testifying" will be sworn in, something that did not occur here. See 3 V.S.A. § 810 (mandating use of Rules of Evidence in contested cases before an agency, including Rule 603, which requires oath or affirmation of truthful testimony).

with the majority's belief that "local officials are generally more familiar with the interests of their community and are best equipped to make decisions on local matters." *Id.* Unlike my colleagues, I recognize that when such "interests" and "local matters" hinge on interpersonal grudges, it is the role of the judiciary to ensure that minimal standards of due process survive.

¶ 31. Absent the technical expertise necessary to receive judicial deference and because the selectboard's decision was based on an informal and conflict-laden proceeding totally devoid of testimony or evidence as we commonly understand them, I would remand this case to the trial court to conduct a de novo review.

¶ 32. I am authorized to state that Justice Burgess joins in this dissent.

As modified October 21, 2010.